Anderson, J.,
delivered the opinion of the court.
The dedication of a street or public highway may be made either with or without writing, by any act of the owner, such as throwing open his land to the public travel, or an acquiescence in the use of his land as a highway. Angelí on Highways, § 142. Where streets and alleys have been opened by the owner of the soil, and used by the public, with his assent, as a public thoroughfare for years, a dedication of the easement may be pi’esumed, and the continued and uninterrupted use, with the knowledge and acquiescence of the owner, will justify the presumption of a dedication to the public, provided the use has continued so long that private *716 rights and the public convenience might be materially affected by an interruption of the enjoyment. But any of ownership by the owner of the soil would repel the presumption. Allen, J., in Skeen v. Lynch, &c., 1 Rob. R. 202. But there must be not only a dedication, but acceptance by the public.
In England it is held that the presumption of the dedication by the owner from' his acquiescence in the use of the land as a highway by the public is sufficient. Butin this state it was held by the general court in Kelly’s case, 8 Gratt. 632, that this doctrine, as applied in England, is inapplicable to county roads in this countiy, and that in this state there must be not only a dedication presumable from the user, but an acceptance by the county court, evidenced by some act of record. But Judge Leigh, who delivered the opinion of the court, excepted expressly streets and alleys in towns from the operation of this principle. As to them the acts of corporation officers may have the same effect as the acts of the county courts.
In Harris’ case, 20 Gratt. 833, the doctrines on this subject were considered, and Judge Staples, in whose opinion all the judges concurred, states the doctrine as held by this court with as much clearness and precision as can well be done. He says: “It is well settled there must be not only a dedication by the owner, but an acceptance by the public. Whether some act on the part of the authorities charged with the control or repair of the highway is necessary to constitute an acceptance, or whether it may be effected by a mere user of the property, is a question upon which the authorities are not agreed.” After a brief notice of Kelly’s case, he says: “ It may be safely assumed that iu this state there may be a valid acceptance of an easement in a town without any distinct act of recognition by the corporate authorities of such town. The mere user, however, by the public of the locus in quo will not of itself constitute an acceptance, *717 without regard to the character of the use and the circumstances, and length of time under which it was claimed and enjoyed.” And he concludes that “when property in a town is set apart for public use and is enjoyed as such, and public and private rights are acquired with reference to it and to its enjoyment, the law presumes such an acceptance on the part of the public as will operate an estoppel in pais, and preclude the owner from revoking the dedication. Numerous other cases than those which he had cited, he says, maintain the principle that the owner is estopped to assert there has been no formal acceptance, where the public, relying upon the manifest interest of the party to dedicate the property, have entered into the occupation of it, in such a manner as renders it improper and unjust to reclaim it.” And cites State v. Trash, 6 Verm. R. 355; Badeau v. Mead & al., 14 Barb. R. 328; and City of Cincinnati v. White, lessee, 6 Peters' U. S. R. 431.
This is an action of trespass quare clausum fregit, brought by A. Y. Stokes & Co., defendants in error here, against the City of Richmond, and involves the right of the city to a section of Twelfth street which is embraced by parallel lines twenty-one feet east of the western line of Twelfth street, and forty feet south of the southern line of Cary street. There is also another suit depending, in 'which the Gallego Mills were plaintiffs below and are defendants here, which involves the right of the city to another section of said Twelfth street, lying between the intersections of Twelfth street with Basin street, and a street thirty feet wide south of the basin in parallel lines with Cary street and a line parallel with the western line of Twelfth street, and twenty-five feet east of it. Precisely the same questions are involved in both suits.
Twelfth street is thirty-two feet six inches in width, crosses Main and Gary streets at right angles, and now extends in a direct line and uniform width in a south *718 ward direction, crossing Cary street to Canal street,-and embracing both of the sections now in dispute.
The following are established as facts in the cause: That seventy years ago, or more, one Bullock erected buildings on the east line of Twelfth street as now used, which buildings extended southwardly from Cary street to an alley about half way between Cary and Canal streets. This alley is a little south of the entrance of the street south of the basin before referred to into Twelfth street. These buildings were substantial bi’ick stores, three stories high, and there was a nan’ow sidewalk some five feet wide in front of them, but which extended no further south than the said alley.
The property adjoining Bullock’s buildings on the south, extending on the eastern line of Twelfth street to Canal street, was owned by Randolph Harrison, and upon it was a warehouse erected for tobacco, formerly owned by William I. Morris; and the property opposite Harrison’s, on the west side of Twelfth street, was used as a coal-yard, on which Peter Chevallie built his mill in 1838, where the Gallego mills now stand. Twelfth street was not open further south than the aforesaid alley. Between Harrison’s lot and Chevallie’s mill no street had been opened, but there was a ravine between them, and Harrison’s property was appi’oaehéd by Thirteenth street. But at least as far back as 1817 Twelfth street was open in front of the Bullock buildings, which extended to the said alley, as it was then used, and has been ever since, except for the short time it was obstructed (in 1858 or 1859) by the grantors of the plaintiffs below erecting a fence on a part of it. It is true that the whole space west of the aforesaid sidewalk of Twelfth street was an-open space as far as the basin—a distance of about one hundred yards—and was used by the James River company, the then owner of the soil, for receiving and delivering goods; but it is a fair infer *719 ence from the evidence that the street, the eastern limit of which was indicated by the Bullock storehouses and the sidewalk, was also used by them and their customers in conveying goods to or from the basin, and by the public in general who had dealings with them or the occupants of the Bullock storehouses, as far back as the year 1817; and since the opening of. the southern section of Twelfth street in 1834 it must have been the great thoroughfare of transit and transportation to and from the Chevallie or Gallego mills and the Harrison tobacco warehouse, and for the freights of the James River and Kanawha canal brought to or carried from the city of Richmond, and which were conveyed to or from Twelfth street along Basin street to or from the boats in the basin.
In 1833 the subject of opening the southern section of Twelfth street, which had become an important thoroughfare, and connecting it with Canal street engaged the earnest attention of the city fathers. 'A difficulty met them at the threshold. Twelfth street as then used had been used since 1817, and probably for many years before. As Bullock had erected costly brick buildings along its eastern margin, it must have been the eastern line of the street then, and for years before, as it cannot be presumed that he would have erected such buildings in the middle of a, public ' street. And in fact there is no evidence in this record that there ever had been a street in use there upon any other location; but it appeared from the report of their •surveyor that as Twelfth street was designated in the original plan of the town, its eastern limit along the southern line of Cary street was twenty-one feet east of its location as then used; so that Bullock’s buildings occupied twenty-one feet of the street as designated in the plan of the town, and Harrison’s warehouse considerably more. If the report of the *720 surveyor was correct, the city could not open and extend Twelfth street through to Canal street upon its present line without acquiring the right from the owner of the soil on which it would be located. All difficulty was removed, and the way made clear by the proposition of Mr. Harrison to purchase from Chevallie the land upon which the extension of Twelfth street would be located, and to convey it to the city to be used for this purpose, if the city would release to him any claim it might have to the land, or the right of way over it, upon which his buildings were erected. This proposition was accepted by the city, and Twelfth street was opened and graded and extended through to Canal street, on the line of its location and use in front of the Bullock buildings, and the whole street, from its intersection with Cary to its intersection with Canal street, was graded and paved its whole width of thirty-two feet and six inches. This was done openly, with the knowledge and in the presence of the owner of the soil, and so far as appears without objection or question as to the right of the city to do what she did. ¥e think it is fair to presume that the city council would not have accepted the proposition of Mr. Harrison, and incurred the expense of filling the ravine, and opening and grading the street between his buildings and Chevallie’s mill, and of grading and paving the whole street from Cary to Canal, if any question had been raised by the'owner of the soil to its right to the street in front of the Bullock buildings until such question was definitively settled, or if its counsel had any doubt as to its right. And it being done in the presence and with the knowledge of the canal company, or its agents, who stood by and allowed the city to lay out and incur the expense of grading and paving this street, as and for a public street, without objection, it is estopped thereby *721 afterwards to set up a claim to it; and its grautees can have no better right.
They claim under a deed of conveyance from John A. Lancaster and S. S. Baxter, as trustees of the James Liver and Kanawha company, hearing date the 2d of June, 1845, which describes the first lot conveyed, which embraces the section which is involved in this suit, as bounded on one side by Cary street, on another side by Twelfth street, and on a third side by a street thirty feet wide, called Basin street, running along the northern margin of the basin, and extended eastwardly until it meets Twelfth street, and describes the other lot which is involved in the other suit, depending in this court upon a writ of error, hereinbefore referred to, as bounded on one side by Basin street, on another side by Twelfth street, and on a third side by a street thirty feet in width, to be laid out between the ground then sold, as now designated, and the buildings belonging to the grantees, 'Warwick & Barks-dale, called the Gallego mills, sometimes called Chevallie’s mills.
This deed was made to the parties ■who were the owners of the Gallego or Chevallie mills, which boi’dered on Twelfth street as it was laid off, graded and paved by the city to the exact width of Twelfth street eleven years before, of which they must be presumed to have had cognizance, and the part of which street lying west of the Bullock buildings, to sections of which they set up claim under said deed, had been used by the said city as a continuation of Twelfth street south of Cary at least for twenty-eight years prior to the' date of said conveyance to them with the acquiescence of their grantors. They purchased, therefore, with the knowledge that the city claimed thirty-two feet six inches west of the Bullock buildings, as shown by the paving of that width, as *722 a continuation of Twelfth street south of Cary; and by enquiry they might have known that it had been used as Twelfth street south of Cary for more than twenty-eight years prior to the date of said deed of conveyance to them, and that there was not, and most probably never had been, any other Twelfth street in use south of Cary street, and, consequently, that in purchasing they purchased subject to the city’s easement; and such, indeed, is the import of the deed read in the, light of the surrounding circumstances, of which they must have been cognizant; that if it was designed to convey any part of the street, the conveyance was intended to be subject to the easement; and, without looking to the map, the deed upon its face does not import a conveyance of any part of the street, the location of which was then well defined and understood by all the parties; and the map referred to seems to have been carelessly and imperfectly prepared, for, among other errors, it lays down Twelfth street as having a width of thirty-six feet six inches, when its width is only thirty-two feet six inches—adding about one-eighth to its actual wúdth. Angelí, § 142, supra., says that the platting of land by the owner, and selling lots hounded by streets designated by the plat, thereby indicates a clear intention to dedicate, or an acquiescence in the use of his land as a highway. The deed to Warwick & Barksdale not only describes the lots sold to them as bounded on one side by Twelfth street, but also on another side by an existing street, called Basin street, which it describes as thirty feet wide and running along the northern margin of the basin, and extending eastwardly until it meets Twelfth street. How, this street is described as an existing street, and as then extending eastwardly until it meets Twelfth street. This language could apply only to Twelfth street as it then existed and was in use. It could not apply to any other Twelfth street, for there was no other, and never had been, ex *723 cept that which was designated on paper, it is said, in Byrd’s original plan of the town, and never had been an actual street, never had been opened, and could not have been meant in this conveyance, as Basin street did not extend eastwardly to meet it, but only to meet Twelfth street as it was then used and paved and well defined; and beyond it eastwardly there was no street, but a block of the Bullock buildings.
And so as to the boundaries of the other lot conveyed. It was bounded on one side by Basin street, on another by Twelfth street, and on a third side by another street thirty feet, which it was agreed by the parties was to be opened, and the location of which was described, and which mhst necessarily connect with Twelfth street. This was a recognition of the existing Twelfth street. The parties to this deed could hardly be understood to have covenanted to open a new street, the necessary outlet to which would be by Twelfth street, upon the haphazard that another Twelfth street would be opened by the removal of the Bullock buildings, and which, if it were done, could not then be extended through Harrison’s lot to Canal street, as the city, eleven years before, had solemnly released to him any claim it might have to a right of way through his lot. If we turn to the map, we think it plainly shows, by the shaded or black lines, the actual eastern terminus of each of the streets on the margin of the basin to be the western line of Twelfth street as then established and in use. It is true that the boundaries of the lots sold are indicated by dotted lines running into Twelfth street, which may indicate that the fee in the soil is embraced in the conveyance, though subject to the ■easement. How else can the change from a solid to a dotted line be accounted for?
In Denning v. Roon, 6 Wend. R. 651, cited by Angell on Highways, § 143, it was held that if a street has been used and built up along a particular line, and the ad *724 joining owners have acquiesced in the line so built upon, and treated it as the true line of the street for forty or fifty years, they will not be permitted to deny the effect of their acts as a dedication, and to contract the lines of the street, on the ground that by so doing they make them conform to the original survey and lay-out of the street. But the fact of an acquiescence of the.owner in the free use and enjoyment of the way as a public road for the period of twenty years would undoubtedly be sufficient evidence in any case, though there were no further proof of an intention to dedicate. Angell, § 143, citing Kent’s Com. 451, and decisions of New Jersey, New York, North Carolina, Wisconsin and Kentucky. But time, though it is often a very material ingredient, is not indispensable in the act of dedication.
Where a street in the city of New York was widened from forty to sixty feet and used by the public for nineteen years, with the acquiescence of the owner, who paid an assessment for paving it to its full width, it was’ held that the circumstances were abundantly sufficient to warrant the presumption of dedication. Angell, § 143, citing Smith v. The State, 3 Zabriskrie’s R. 130; Maxwell v. East River Bank, 3 Bosworth’s R. 124. But the principle enunciated by this court in the cases cited supra as to the influence of time upon the question of dedication, we think, is clear and definite, to-wit: that the use of the property by the public, with the assent of the owner, will justify the presumption of dedication if the use has continued so long that private rights' and the public convenience might be materially affected by an interruption of the enjoyment. This is upon the principle of equitable estoppel. How does this principle apply to the case in hand? ■
That the public convenience would be materially affected by an interruption of the enjoyment, clearly ap *725 pears from what has been said. And now as to -private rights:
As we have seen, the Bullock buildings were erected as far back as 1817—more than sixty years ago. They were doubtless erected upon what at that time was the eastern line of Twelfth street as it was then used, and in all probability had ever theretofore been used since it had been a street. The buildings were destroyed by the great fire in 1865, and have been rebuilt since upon the-old line. It is easy to see how injuriously private rights would now be affected by permitting the obstruction of the street in front of those buildings and yielding to the demands of the present owners of the soil to reclaim it. From this view of the case it is plain that upon the repeatedly recognized and established principles of this court, the dedication of this section of Twelfth street by the owners of the soil ought to be presumed, there having-been an acquiescence in its long-continued and uninter rupted user, and no adverse claim ever asserted by the owners of the soil until the year 1847. Since that time the right of the city to the easement has been disputed and contested by the owners. But the city, through its council has from time to time directed enquiries, has persistently continued in the possession and enjoyment of the easement, except the temporary interruption by the then owners of the soil in 1858 or 1859, which was promptly resisted by the city. The city has never yielded her right to it as an easement, but after various investigations, through her constituted authorities, came to the conclusion that the city had a right to it as an easement, which was formally announced and the claim of the owners denied. Consequently, no presumption of dedication can arise from the continued user of the ground as a street subsequent to the assertion of the claim by the owners in 1847. But the court is of opinion that the right of the city to the easement, by the long and continued and uninterrupted user, with the *726 assent and acquiescence of the owners of the soil prior to that time, justifies the presumption of a dedica- . tion, and that the owners were thus estopped to reclaim it.
It would protract this opinion too much to pass on the instructions seriatim which were tendered by the defendant and overruled by the court, and the instructions given by the court, and we deem it unnecessary. It will suffice to say that the instructions tendered by the plaintiffs and defendant,'or as given by the court, so far as they are in conflict with the principles declared in this opinion, are erroneous, and so far as they are in conformity with them, they are right. But we think the verdict is in conflict with the instructions as given by the court. We are of opinion, therefore, to reverse the judgment of the circuit court, and to remand the cause for a new trial to be had therein in conformity with the principles declared in this opinion.
Judgment reversed.